UNITED STATES DISTRICT COURT
<u>WESTERN DISTRICT OF NEW YORK</u>

| | | |
|---|---|---|
| JOHNMARK C., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case # 1:21-cv-736-DB |
| | § | |
| COMMISSIONER OF SOCIAL SECURITY, | § | MEMORANDUM |
| | § | DECISION AND ORDER |
| Defendant. | § | |

## INTRODUCTION

Plaintiff Johnmark C. ("Plaintiff") brings this action pursuant to the Social Security Act (the "Act"), seeking review of the final decision of the Commissioner of Social Security (the "Commissioner"), that denied his application for Disability Insurance Benefits ("DIB") under Title II of the Act. *See* ECF No. 1. The Court has jurisdiction over this action under 42 U.S.C. §§ 405(g), 1383(c), and the parties consented to proceed before the undersigned in accordance with a standing order (*see* ECF No. 13).

Both parties moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). *See* ECF Nos. 6, 8. Plaintiff also filed a reply brief. *See* ECF No. 9. For the reasons set forth below, Plaintiff's motion for judgment on the pleadings (ECF No. 6) is **DENIED**, and the Commissioner's motion for judgment on the pleadings (ECF No. 8) is **GRANTED**.

## BACKGROUND

Plaintiff protectively filed an application for DIB on April 19, 2018, alleging disability beginning June 30, 2016 (the disability onset date), due to multiple sclerosis, fatigue, trigeminal neuralgia, paresthesia pain, optic neuritis, migraine headaches, neurogenic pain, cognitive dysfunction, and knee pain. Transcript ("Tr.") 33, 36, 185. Plaintiff's claim was denied initially on

June 28, 2018, after which he requested an administrative hearing. Tr. 33. On June 26, 2020, Administrative Law Judge Timothy M. McGuan ("the ALJ") conducted a telephonic hearing,[1] at which Plaintiff appeared and testified and was represented by his wife and non-attorney representative, Mary Anne Costello. *Id*. Jim Weaver also appeared and testified as a witness for Plaintiff. *Id*.

The ALJ issued an unfavorable decision on August 18, 2020, finding that Plaintiff was not disabled. Tr. 33-39. On May 18, 2021, the Appeals Council denied Plaintiff's request for further review. Tr. 1-6. The ALJ's August 18, 2020, decision thus became the "final decision" of the Commissioner subject to judicial review under 42 U.S.C. § 405(g).

## LEGAL STANDARD

### I.   District Court Review

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citing 42 U.S.C. § 405(g)) (other citation omitted). The Act holds that the Commissioner's decision is "conclusive" if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citations omitted). It is not the Court's function to "determine *de novo* whether [the claimant] is disabled." *Schaal v. Apfel*, 134 F. 3d 496, 501 (2d Cir. 1990).

---

[1] Due to the extraordinary circumstance presented by the Coronavirus Disease 2019 ("COVID-19") pandemic, all participants attended the hearing by telephone. Tr. 33.

## II.     The Sequential Evaluation Process

An ALJ must follow a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Act. *See Parker v. City of New York*, 476 U.S. 467, 470-71 (1986). At step one, the ALJ must determine whether the claimant is engaged in substantial gainful work activity. *See* 20 C.F.R. § 404.1520(b). If so, the claimant is not disabled. If not, the ALJ proceeds to step two and determines whether the claimant has an impairment, or combination of impairments, that is "severe" within the meaning of the Act, meaning that it imposes significant restrictions on the claimant's ability to perform basic work activities. *Id*. § 404.1520(c). If the claimant does not have a severe impairment or combination of impairments meeting the durational requirements, the analysis concludes with a finding of "not disabled." If the claimant does, the ALJ continues to step three.

At step three, the ALJ examines whether a claimant's impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"). *Id*. § 404.1520(d). If the impairment meets or medically equals the criteria of a Listing and meets the durational requirement, the claimant is disabled. *Id*. § 404.1509. If not, the ALJ determines the claimant's residual functional capacity, which is the ability to perform physical or mental work activities on a sustained basis notwithstanding limitations for the collective impairments. *See id*. § 404.1520(e)-(f).

The ALJ then proceeds to step four and determines whether the claimant's RFC permits him or her to perform the requirements of his or her past relevant work. 20 C.F.R. § 404.1520(f). If the claimant can perform such requirements, then he or she is not disabled. *Id*. If he or she cannot, the analysis proceeds to the fifth and final step, wherein the burden shifts to the Commissioner to show that the claimant is not disabled. *Id*. § 404.1520(g). To do so, the

Commissioner must present evidence to demonstrate that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy" in light of his or her age, education, and work experience. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quotation marks omitted); *see also* 20 C.F.R. § 404.1560(c).

## ADMINISTRATIVE LAW JUDGE'S FINDINGS

The ALJ analyzed Plaintiff's claim for benefits under the process described above and made the following findings in his August 18, 2020 decision:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2016.

2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of June 30, 2016 through his date last insured of December 31, 2016 (20 CFR 404.1571 *et seq*.).

3. Through the date last insured, there were no medical signs or laboratory findings to substantiate the existence of a medically determinable impairment (20 CFR 404.1520(c)).

4. The claimant was not under a disability, as defined in the Social Security Act, at any time from June 30, 2016, the alleged onset date, through December 31, 2016, the date last insured (20 CFR 404.1520(c)).

Tr. 33-39.

Accordingly, the ALJ determined that, based on the application for a period of disability and disability insurance benefits filed on April 19, 2018, the claimant was not disabled under sections 216(i) and 223(d) of the Social Security Act through December 31, 2016, the last date insured. Tr. 39.

## ANALYSIS

Plaintiff asserts three points of error. First, Plaintiff argues that the ALJ improperly concluded that Plaintiff's multiple sclerosis ("MS") was not a medically determinable impairment during the relevant time period. *See* ECF No. 6-1 at 1, 9-18. Next, Plaintiff argues that the ALJ

failed in his duty to develop the record because he did not adequately investigate the nature of Plaintiff's MS during the relevant period. *See id*. at 18-21. Finally, Plaintiff argues that the Appeals Council improperly rejected a medical opinion from treating neurologist Svetlana P. Eckert, M.D. ("Dr. Eckert"), submitted after the date of the ALJ's decision. *See id*. at 21-24.

The Commissioner argues in response that substantial evidence supports the ALJ's decision that Plaintiff failed to provide objective medical evidence demonstrating the existence of a medically determinable severe impairment, including multiple sclerosis, during the period at issue (June 30, 2016 through December 31, 2016). *See* ECF No. 8-1 at 20-30. The Commissioner also argues that the ALJ fulfilled his duty to develop the record, and "scrupulously" developed the evidence to ensure that he had Plaintiff's complete medical history and confirmed that no contemporaneous medical evidence during the six-month relevant period existed. *See id*. at 17-20. Moreover, noted the Commissioner, the ALJ adequately explained the importance of the date last insured and explained that the lack of evidence prior to that date would not support a finding for disability. *See id*. at 18 (citing Tr. 47-49). Finally, the Commissioner argues that the Appeals Council properly declined to exhibit Dr. Eckert's August 2020 opinion because it did not show a reasonable probability that it would change the outcome of the ALJ's decision. *See id*. at 30-31.

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence." 42 U.S.C. § 405(g); *see also Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa*, 168 F.3d at 77.

The Court notes that the relevant period at issue in this case—from Plaintiff's June 30, 2016 alleged disability onset date through his December 31, 2016 date last insured—is only six months.  Upon review of the entire record and the ALJ's decision, the Court finds that the ALJ carefully reviewed the record to conclude that Plaintiff did not establish the existence of any medically determinable impairment(s), including multiple sclerosis, during the relevant period, as required for purposes of entitlement to DIB. Despite the lack of treatment, examining, and diagnostic records relevant to the period in question, the record indicates that the ALJ made every effort to develop the record and ensured he had a complete medical record prior to issuing his decision. In fact, the ALJ reviewed evidence from the period after Plaintiff's date last insured, including retrospective statements speculating about Plaintiff's condition during the period in question, but reasonably found that this evidence did not support the existence of a medically determinable severe impairment during the relevant period. Finally, the Appeals Council properly determined that the medical evidence submitted after the ALJ's August 2020 decision did not show a reasonable probability of changing the outcome of the ALJ's decision. Accordingly, the Court finds no error.

The file contains only one medical examination prior to Plaintiff's date last insured. On July 30, 2012, Plaintiff established care with Sameer Mamnoon, M.D. ("Dr. Mamnoon"), at Adult Medical Services. Tr. 315. Plaintiff reported he had been seen in the emergency room with a right ankle puncture wound and abrasion with bruising; the record does not document when the injury occurred. *Id*. Plaintiff complained of impaired left eye vision, although he denied diplopia (double vision), fatigue, joint pain, or weakness. *Id*. Dr. Mamnoon observed "severe vision impairment" in the left eye but otherwise noted completely normal examination findings, including negative for fatigue, weakness, paresthesia, diplopia, and joint pain, and "unremarkable" left eye examination,

with no corneal abrasion. Tr. 315-16. Plaintiff was advised to see an ophthalmologist; he was also advised to go to the emergency department for active and urgent attention if his vision impairment persisted. Tr. 316. As noted, this was the only evidence in the record prior to the date last insured.

On January 17, 2018, more than one year after the expiration of his December 31, 2016 date last insured, Plaintiff sought emergency treatment at Kenmore Mercy Hospital ("Kenmore") Emergency Department ("ED") for headache associated with sinusitis and double vision. Tr. 268-91. A CT of the head showed no acute intracranial abnormalities, and a "polyp versus mucus retention cyst inferior left maxillary sinus." Tr. 269-70, 271-72. Upon examination, Plaintiff denied any eye deficit, and his vision was 20/20 bilaterally. Tr. 279-80. He was in no distress, was cooperative, and exhibited steady gait and no neurological deficits. *Id*. Plaintiff was discharged in stable condition with referral to neurologist and an ear/nose/throat ("ENT") specialist. Tr. 284.

On January 22, 2018, Plaintiff sought treatment with neurologist Amir Mazhari, M.D. ("Dr. Mazhari"), at DENT Neurologic Institute ("DENT"), for complaints of recent diplopia and face pain. Tr. 301-04, 321-24. Plaintiff denied headaches, ptosis, speech changes, dysphasia, or focal weakness. Tr. 301. He reported he was employed doing computer work, home repairs, and landscaping. Tr. 302. Dr. Mazhari reviewed the head CT scan from Kenmore ED and agreed with the findings of "no acute process. unremarkable." Tr. 301. Upon examination, Dr. Mazhari noted grossly normal clinical findings, including normal visual acuity, attention, concentration, memory, coordination, cranial nerves, gait, station, sensation, strength, and reflexes, and a negative Romberg sign. Tr. 303.

Plaintiff returned to DENT for follow-up on February 1 and 15, 2018. Tr. 294-300, 325-34. On February 1, 2018, Plaintiff reported "interval improvement but not quite at baseline." Tr. 298. Plaintiff also reported some tooth and face pain triggered by touch and chewing. *Id*. MRI

studies of the brain and thoracic and cervical spines yielded abnormal findings suggestive of demyelinating disease, such as multiple sclerosis. Tr. 294, 298-99, 400-05. Dr. Mazhari ordered additional testing to further assess Plaintiff's condition. Tr. 300.

On February 15, 2018, Plaintiff had a follow-up visit with Dr. Mazhari to review his test results. Tr. 294. Plaintiff reported improvement in his left face paresthesia and diplopia and only still had chronic residual fatigue. *Id*. Dr. Mazhari noted that Plaintiff had an abnormal MRI of the brain, which showed periventricular, subcortical, and brainstem hyperintensities, indicative of multiple sclerosis; an abnormal MRI of the cervical spine showing multiple lesions involving the cervical and upper thoracic spinal cord; and an abnormal MRI of the thoracic spine showed discrete lesions, with two larger ones occurring at T9 and T11. *Id*. Dr. Mazhari noted that Plaintiff was likely experiencing relapsing remitting multiple sclerosis, likely onset five years ago, with intermittent spells of diplopia, improved face paresthesia, and residual chronic fatigue. Tr. 297. A "Pattern Visual Evoked Response" study to rule out MS performed on February 7, 2018 was normal. Tr. 407-09.

Follow-up visits at DENT in May, September, and October 2018, including repeat MRIs in August 2018, showed no significant diagnostic or clinical changes, although Plaintiff experienced a flare-up of facial trigeminal neuralgia in October. Tr. 305-09, 335-39, 341-45, 398-401, 346-50, 361-70, 400-01. Plaintiff continued treatment at DENT through June 2019, with examinations yielding continued normal clinical and neurological findings, a stable condition on medication, and improvement of symptoms, particularly the neuralgia. Tr. 351-58, 371-81 382-93.

Plaintiff's file was reviewed by T. Bruni, Ph.D. ("Dr. Bruni"), on June 21, 2018. Tr. 69. As there was no evidence for the period being reviewed, Dr. Bruni opined that there was no medical record to establish a medically determinable impairment. *Id*. On June 25, 2018, Plaintiff's

file was reviewed by C. Krist, D.O. ("Dr. Krist"). Tr. 70. Dr. Krist similarly opined that Plaintiff did not have a medically determinable impairment. Tr. 69-70.

Plaintiff sought a second opinion from UBMD Neurology on October 31, 2019, where he was evaluated by Dr. Eckert. Tr. 426-33. Plaintiff reported having problems with vision and severe fatigue for the past 5-8 years. Tr. 426. Dr. Eckert assessed that Plaintiff's last MS relapse likely occurred around January 2017 and his initial onset was around 2012, but "[he] did not seek care." Tr. 430. Dr. Eckert noted that Plaintiff had normal gait and station, range of motion, attention, and concentration, intact memory, sensation, and coordination including negative Romberg sign, and no spasticity, or resting or intention tremors. Tr. 429-30. Follow-up visits in with Dr. Eckert in December 2019, March 2020, and June 2020 continued to reveal largely unremarkable examination findings and "good control of symptoms" with treatment and medications. Tr. 310-313, 434-60. Follow-up brain MRIs in October 2019 and April 2020 continued to show no interval change, indicating "stable disease." Tr. 394-95, 396-97, 463-66.

On June 22, 2020, Dr. Eckert wrote a letter stating that they extensively discussed Plaintiff's neurologic symptoms preceding his MS diagnosis during his October 2019 initial visit, and it "became clear that [Plaintiff] likely had several MS relapses at least six years prior to being diagnosed with MS in 2018." Tr. 467. She opined that Plaintiff's previous symptoms/relapses were noted to be vision problems around 2011-2012, severe fatigue around 2013-2014 for a few months that improved but not completely back to baseline. *Id*. Dr. Eckert noted that since 2013-2014, Plaintiff had continued to be extremely fatigued for many years on and off, sometimes with fatigue so severe where he would have to stay in bed for several days at a time, and this affected his ability to work well prior to the diagnosis of MS. *Id*. Dr. Eckert opined, based on her review of Plaintiff history, that his symptoms of MS that developed many years prior to the actual MS diagnosis

significantly affected his ability to perform his daily activities at work due to severe fluctuating fatigue and changes in vision. *Id*.

On August 16, 2020, after both the hearing and issuance of the ALJ's decision, Dr. Eckert completed a Medical Statement of Ability to Do Work-Related Activities (Physical). Tr. 11-16. The statement was proffered for the first time to the Appeals Council upon Plaintiff's request for review of the ALJ's decision. Tr. 1-2.  Dr. Eckert opined that Plaintiff could frequently lift and/or carry up to 10 pounds; occasionally lift and/or carry between 11 and 50 pounds; and never lift and/or carry 51 to 100 pounds. Tr. 11. She also opined that Plaintiff could only sit for 4 hours at one time and only stand or walk for 3 hours each at one time; sit for 6 hours total in an 8-hour workday; stand for 2 hours total; and walk for 3 hours total. Tr. 12.

Dr. Eckert noted that because Plaintiff had experienced sensory changes in the hands and weakness with exertion or prolonged use, he could frequently reach, handle, and finger with his right hand and only occasionally feel and push//pull with his right hand. Tr. 13. She also noted that Plaintiff had "leg weakness, knee giving out periodically, and balance difficulty." *Id*. Dr. Eckert further opined that Plaintiff could only frequently operate foot controls (Tr. 13), and due to leg weakness and balance issues, he could never climb ladders or scaffolds and only occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl (Tr. 14). She additionally opined that Plaintiff could never be at unprotected heights or around dusts, odors, fumes, pulmonary irritants, or extreme heat; only occasionally be around moving mechanical parts, humidity, extreme cold, and vibrations; could frequently operate a motor vehicle; and only tolerate a moderate noise level. Tr. 15. Dr. Eckert also indicated that Plaintiff's "cognition was slightly slowed, so rapid-paced work requiring quick, persistent thinking would be difficult." Tr. 16. Notably, Dr. Eckert opined that these limitations existed prior to January 2017. Tr. 16.

Although Plaintiff originally alleged that he had been disabled since April 1, 2017 (Tr. 164), he later changed his onset date to June 30, 2016, the date he stopped working (Tr. 186). Plaintiff alleges that he was "unjustly fired" because he was absent from a work on a day that he had both requested and been approved to be off. Tr. 186. Plaintiff also alleges that he had been having an "increasingly difficult" time at work due to his symptoms, even though he had not been diagnosed with MS at that time. *Id*.

At the hearing, Plaintiff's spouse and non-attorney representative confirmed that Plaintiff did not see Dr. Eckert until October 2019, after which Plaintiff transferred his care from DENT to UBMD Neurology. Tr. 47. Plaintiff testified that prior to his MS diagnosis in early 2018, he could bike 200 miles a week. Tr. 55, 56. A function report competed in May 2018 indicated that while Plaintiff had difficulties caused pain, they did not preclude his ability to perform activities of daily living, including driving, chores, meal preparation, reading, childrearing, shopping, paying bills, computer work, family outings, attending religious services, and running errands with the children including taking them to the extra-curricular activities. Tr. 207-10.

Jim Weaver ("Mr. Weaver") testified at the hearing as a third-party witness. Tr. 53-55. He testified that he watched Plaintiff slowly decline in strength and pace, but he was unable to substantiate when Plaintiff started experiencing symptoms related to his alleged impairments. Tr. 54-55. Mr. Weaver also testified that prior to Plaintiff having multiple sclerosis, he was strong and able to move furniture but, over the years, he slowed down and "took longer to get things done []," "he's still pretty strong but he just didn't have the stamina." Tr, 54. Again, Mr. Weaver could not give dates to when that occurred. *Id*.

**I.      The ALJ Properly Concluded That Plaintiff Did Not Have a Medically Determinable Impairment During the Relevant Period.**

Plaintiff first argues that the ALJ erred when he concluded that Plaintiff's multiple sclerosis was not a medically determinable impairment during the relevant time period. *See* ECF No. 6-1 at 9-18. Contrary to Plaintiff's argument, however, the ALJ carefully reviewed the record to conclude that Plaintiff did not establish the existence of any medically determinable impairment(s), including multiple sclerosis, during the six-month relevant period of June 30, 2016, his alleged disability onset date, through December 31, 2016, his date last insured.

It is Plaintiff's burden to provide evidence to establish that he was disabled throughout the period for which he seeks benefits. 20 C.F.R. § 404.1512(a); *see Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); *Schauer v. Schweiker*, 675 F.2d 55, 59, (2d Cir. 1982). To satisfy that burden, Plaintiff must furnish evidence establishing that he was unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A), (d)(5)(A). Moreover, in order for Plaintiff to qualify for DIB, his disability must have commenced at a time when he met the insured status requirements as provided by the Act, *i.e.*, on or before December 31, 2019. Tr. 27. *See* 42 U.S.C. § 423(a)(1)(A), (c)(1); 20 C.F.R. §§ 404.131, 404.315(a)(1), 404.320(b)(2).

Moreover, whether Plaintiff was disabled under the Act is a decision reserved to the Commissioner alone. *See* 20 C.F.R. §§ 404.1503, 404.1520b(c)(3) ("[the Commissioner is] responsible for making the determination or decision about whether [a claimant] is disabled" under the Act]. As noted above, the regulations set forth a five-step sequential analysis that the Commissioner must follow in determining Plaintiff's disabled status. 20 C.F.R. § 404.1520. A claimant bears of showing he has a medically determinable impairment that is severe and meets

the duration requirement of the Act in order to move past the second step of the sequential analysis. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

Effective for claims filed on or after March 27, 2017, the Social Security Agency comprehensively revised its regulations governing medical opinion evidence creating a new regulatory framework. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15, 132-01 (March 27, 2017). Plaintiff filed his application on April 19, 2018, and therefore, the 2017 regulations are applicable to his claim.

First, the new regulations change how ALJs consider medical opinions and prior administrative findings.  The new regulations no longer use the term "treating source" and no longer make medical opinions from treating sources eligible for controlling weight. Rather, the new regulations instruct that, for claims filed on or after March 27, 2017, an ALJ cannot "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings(s), including those from [the claimant's own] medical sources." 20 C.F.R. § 416.920c(a) (2017).

Second, instead of assigning weight to medical opinions, as was required under the prior regulations, under the new rubric, the ALJ considers the persuasiveness of a medical opinion (or a prior administrative medical finding). *Id*. The source of the opinion is not the most important factor in evaluating its persuasive value. 20 C.F.R. § 416.920c(b)(2). Rather, the most important factors are supportability and consistency.  *Id*.

Third, not only do the new regulations alter the definition of a medical opinion and the way medical opinions are considered, but they also alter the way the ALJ discusses them in the text of the decision. 20 C.F.R. § 416.920c(b)(2). After considering the relevant factors, the ALJ is not

required to explain how he or she considered each factor. *Id*. Instead, when articulating his or her finding about whether an opinion is persuasive, the ALJ need only explain how he or she considered the "most important factors" of supportability and consistency. *Id*. Further, where a medical source provides multiple medical opinions, the ALJ need not address every medical opinion from the same source; rather, the ALJ need only provide a "single analysis." *Id*.

Fourth, the regulations governing claims filed on or after March 27, 2017 deem decisions by other governmental agencies and nongovernmental entities, disability examiner findings, and statements on issues reserved to the Commissioner (such as statements that a claimant is or is not disabled) as evidence that "is inherently neither valuable nor persuasive to the issue of whether [a claimant is] disabled." 20 C.F.R. § 416.920b(c)(1)-(3) (2017). The regulations also make clear that, for claims filed on or after March 27, 2017, "we will not provide any analysis about how we considered such evidence in our determination or decision" 20 C.F.R. § 416.920b(c).

Finally, Congress granted the Commissioner exceptionally broad rulemaking authority under the Act to promulgate rules and regulations "necessary or appropriate to carry out" the relevant statutory provisions and "to regulate and provide for the nature and extent of the proofs and evidence" required to establish the right to benefits under the Act. 42 U.S.C. § 405(a); *see also* 42 U.S.C. § 1383(d)(1) (making the provisions of 42 U.S.C. § 405(a) applicable to title XVI); 42 U.S.C. § 902(a)(5) ("The Commissioner may prescribe such rules and regulations as the Commissioner determines necessary or appropriate to carry out the functions of the Administration."); *Barnhart v. Walton*, 535 U.S. 212. 217-25 (2002) (deferring to the Commissioner's "considerable authority" to interpret the Act); *Heckler v. Campbell*, 461 U.S. 458, 466 (1983). Judicial review of regulations promulgated pursuant to 42 U.S.C. § 405(a) is narrow and limited to determining whether they are arbitrary, capricious, or in excess of the

Commissioner's authority. *Brown v. Yuckert*, 482 U.S at 145 (citing *Heckler v. Campbell*, 461 U.S. at 466).

As the ALJ noted, Plaintiff neither provided nor referred to evidence related to the relevant period of June 30 through December 31, 2016. Tr. 35-39. Furthermore, Plaintiff and his non-attorney representative (his spouse) acknowledged that there was no contemporaneous medical diagnostic or treatment evidence during the relevant six-month period. Tr. 36, 38, 46-62, 262-64, 426, 467. Moreover, Plaintiff admitted that he was not diagnosed with multiple sclerosis until January 2018—over a year after the expiration of his December 2016 date last insured. Tr. 47, 49-50, 52-53, 55-56, 268-304, 402-05. Additionally, when, on July 17, 2020, the agency contacted Plaintiff's representative requesting medical source information, she "confirmed there was no other evidence earlier than January 2018 and a very recent neurologist." Tr. 262. Thereafter, Plaintiff's representative forwarded treatment records from DENT and UBMD Neurology, all dated well after the relevant period. Tr. 264, 319-467. Still, none of those records related back to the period on or before Plaintiff's insured status expired on December 31, 2016.

In an effort to demonstrate that there was medical evidence showing that Plaintiff's multiple sclerosis existed prior to his date last insured of December 31, 2016, Plaintiff references his complaint of impaired left eye vision at his July 2012 visit with Adult Medical Services. *See* ECF No. 6-1 at 9-18 (citing Tr. 56, 58, 317, 314-16). However, the medical record fails to support Plaintiff's contention. As the ALJ noted, this single examination report did not reflect any abnormal objective medical signs or laboratory findings to substantiate the existence of a medically determinable impairment. Tr. 36. Despite complaining of impaired left eye vision, Plaintiff specifically denied diplopia, fatigue, joint pain, or weakness, and examination findings were

15

unremarkable. Tr. 36, 315-16. Accordingly, the ALJ reasonably determined that this isolated treatment record did not establish the existence of any medically determinable impairment. *Id*.

Plaintiff confirmed that following that one-time visit on July 30, 2012 (nearly four years prior to the period at issue), he did not continue treatment at Adult Medical Services. Tr. 48, 58, 314-17, 426, 467. Years later, at his initial October 2019 visit with Dr. Eckert, Plaintiff admitted that he had not sought continued care in at that time as he did not have a primary care physician, and he also reported that his left eye vision improved, as did his fatigue. Tr. 426, 467.

Plaintiff also references Dr. Eckert's June 2020 narrative, in which she referenced an MRI finding in April 2020 of a left optic nerve lesion and opined that Plaintiff likely was already suffering from optic neuritis in 2012. *See* ECF No. 6-1 at 12 (citing Tr. 17, 465, 467). However, the record is devoid of any corroborating medical signs, laboratory findings or objective testing. On the contrary, evidence more contemporaneous to the relevant period, including normal findings on a February 2018 visual field evoked response study (Tr. 407-09), Dr. Mazhari observation of no optic lesion in his February 2018 narrative of a concurrent brain MRI (Tr. 294, 298), and August and October 2018 MRIs showing no optic nerve abnormality (Tr. 394-95, 400-01), refute Plaintiff's contention that a medically determinable impairment of multiple sclerosis existed during the period in question. Thus, Plaintiff's effort to relate later diagnostic/clinical findings to the relevant period fails.

Moreover, Plaintiff concedes that he was not diagnosed with multiple sclerosis until an episode of double vision in January 2018 (Tr. 50), for which he first sought emergency room treatment and subsequently commenced neurological treatment at DENT in January 2018 where he underwent an MRI that first suggested demyelinating disease, *i.e.*, multiple sclerosis. Tr. 268-91, 294-304, 402-03). Plaintiff also concedes that he sought no treatment between July 2012 and

January 2018, and thus, no treatment records would exist. Tr. 38, 45-62, 262-64, 426, 467. Therefore, without any medical evidence prior to December 31, 2016 to substantiate Plaintiff's allegations or any evidence to establish that he was unable to work at the level of substantial gainful activity, the ALJ properly determined that any symptoms Plaintiff had prior to December 31, 2016 did not significantly impact his ability to perform basic work activities. Tr. 38.

Plaintiff contends that just because there was no actual diagnosis of multiple sclerosis prior to January 2018, that "doesn't mean that [he] didn't have it." Tr. 50. However, a medically determinable impairment that reached disabling severity after the expiration of an individual's insured status cannot be the basis for the determination of entitlement to DIB, despite its existence before the individual's insured status expired. *See Arnone v. Bowen*, 882 F.2d 34, 37-38 (2d Cir. 1989); Gold v. Sec'y of HEW, 463 F.2d 38, 40-41 (2d Cir. 1977); *Daryle O. V. Kijakazi*, 2021 WL 3077891, at *5 (W.D.N.Y. July 21, 2021); *accord Woods v. Colvin*, 218 F.Supp.3d 204, 207 (W.D.N.Y. 2016) ("[u]nder Title II, a period of disability cannot begin after a worker's disability insured status has expired").

The ALJ also considered evidence after the relevant period, including Plaintiff's normal examination findings at his initial evaluation with DENT in January 2018 (Tr. 302) and Dr. Eckert's June 2020 opinion (Tr. 467). Tr. 35-39. Contrary to Plaintiff's argument (*see* ECF No. 6-1 at 9-16), the ALJ considered Dr. Eckert's June 2020 opinion and properly found it unpersuasive. Tr. 38-39, 467. As noted above, Dr. Eckert opined that Plaintiff's symptoms of multiple sclerosis developed many years prior to the condition's diagnosis in early 2018 and affected his ability to perform his daily activities at work due to severe fluctuating fatigue and changes in vision. Tr. 467. Appropriately applying the new regulations, the ALJ reasonably concluded that the opinion was not supported by or consistent with the objective medical evidence, signs, or findings; it was

based primarily on Plaintiff's subjective statements; and it was inconsistent with Plaintiff's ability to work through half of 2016. Tr. 38-39, 171, 178-79, 467. *See* 20 C.F.R. § 404.1520c(c)(1), (2) (supportability and consistency factors).

Furthermore, Dr. Eckert relied on Plaintiff's incorrect timeline of his symptomatology, alleging that his double vision started in November 2018 after he and his family moved into a house; or, around January 2017 when he sought emergency treatment at Kenmore Mercy Hospital. *See* Tr. 426, 467. However, notes from Kenmore ED indicate that Plaintiff first experienced double vision in January 2018. *See* Tr. 278. *Polynice v. Colvin*, 576 F. App'x 28, 31 (2d Cir. 2014) ("Much of what Polynice labels 'medical opinion' was no more than a doctor's recording of Polynice's own reports of" symptoms); *Lewis v. Colvin*, 548 F. App'x 675, 678 (2d Cir. 2013) (physician opinion was not compelling because it was based on the claimant's subjective complaints).

Dr. Eckert's assessment was also unsupported by her own initial medical history intake noting that Plaintiff's left eye vision impairment and fatigue from years prior had improved, and he did not seek contemporaneous primary care or orthopedic treatment. Tr. 426, 467. Furthermore, her assessment that an optic nerve lesion first seen on an April 2020 brain MRI "confirms evidence of prior optic neuritis" (Tr. 467) was contradicted by findings in prior August and October 2018 brain MRIs (Tr. 394-95, 400-01), normal findings on a February 2018 visual field evoked response study (Tr. 407-09), and by Dr. Mazhari noting no optic lesion in his February 2018 narrative of a concurrent brain MRI (Tr. 294, 298).

Finally, Dr. Eckert's June 2020 opinion is inconsistent with the findings of the state agency medical consultants, who found insufficient evidence establishing the existence of a medically determinable impairment on or before December 31, 2016 (Tr. 68-69). 20 C.F.R. § 404.1520c(c)(c)(2); *see Reynolds v. Colvin*, 570 F. App'x 45, 48 (2d Cir. 2014) (holding that

substantial evidence supported the ALJ's discounting retrospective medical opinions from treating sources as to Reynold's condition prior to the expiration of his last date insured, because the physicians did not examine Reynolds until well after the period, and record evidence failed to corroborate their retrospective opinions contemporaneous to the period in question).

The ALJ also considered and found unpersuasive the February 2018 opinion of DENT neurologist Dr. Mazhari that Plaintiff had "likely relapsing remitting multiple sclerosis" with a "likely onset" five years prior with intermittent spells of diplopia, improved face paresthesias, and residual chronic fatigue. Tr. 39, 297. The ALJ found this opinion unpersuasive for the same reasons as Dr. Eckert's opinion—it was not supported by or consistent with the objective evidence and based solely on Plaintiff's subjective statements. Tr. 39, 296-297. *See* 20 C.F.R. § 404.1520c(c)(1), (2). Thus, the treatment records post-dating Plaintiff's date last insured revealed, little, if any, evidence establishing the existence of a medically determinable impairment during the relevant period.

The ALJ also considered Plaintiff's subjective statements, including those provided in a disability report dated April 2018, but concluded that such evidence reflected functioning well past the date last insured and, thus, did not establish the existence of limitations attributable to a medically determinable or severe impairment on or before December 31, 2016. Tr. 38, 206-18. Furthermore, Plaintiff's subjective statements were insufficient under both the Act and the Commissioner's regulations providing that a medically determinable impairment can only be established by objective medical evidence that include signs and laboratory findings, as the ALJ properly determined. Tr. 38-39. *See* 42 U.S.C. § 423(d)(1)(A), (d)(3); 20 C.F.R. §§ 404.1508, 404.1528; SSR 16-3p ("[a]n individual's symptoms . . . will not be found to affect the ability to perform work-related activities for an adult . . . unless medical signs or laboratory findings show

a medically determinable impairment is present"); SSR 96-4p ("[a] 'symptom' is not a 'medically determinable physical or mental impairment' and no symptom by itself can establish the existence of such an impairment.").

Similarly, the ALJ found the testimony of third-party witness Mr. Weaver unpersuasive, as Mr. Weaver was unable to substantiate when Plaintiff started experiencing increased symptoms. Tr. 38-39, 54-55). *See* 20 C.F.R. §§ 404.1520c(d), 404.1529(c)(3); 404.1529(c)(3); SSR 16-3p (consideration of information provided by third party witnesses).

The ALJ also considered evidence showing that Plaintiff was able to work at the level of substantial gainful activity in 2015 and 2016. Tr. 38, 186-87. Plaintiff stopped working on June 30, 2016. Tr. 186. Plaintiff reported that he was having an increasingly difficult time at work at that time and knew something was wrong with him, but he did not yet know of his multiple sclerosis. Tr. 38, 186. However, as the ALJ reasonably found, the fact that Plaintiff was working six months prior to his date last insured of December 31, 2016; he did not stop working because of his medical condition; and he was not seeking any medical treatment is additional evidence suggesting that Plaintiff did not have a medical impairment that was significantly impacting his ability to perform basic work activities prior to his date last insured. Tr. 38.

Moreover, disability under the Social Security Act requires more than the mere presence of a disease or impairment; Plaintiff needed to show that the disease or impairment resulted in functional limitations precluding him from engaging in any substantial gainful activity. *See Monguer v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983); *Carroll v. Sec'y of Health & Hum. Servs.*, 705 F.2d 638, 642 (2d Cir. 1983); *Rivera v. Harris*, 623 F.2d 212, 215-16 (2d Cir. 1980). Based on the foregoing, the ALJ properly determined at step two of the sequential evaluation that Plaintiff did not have a medically determinable severe impairment from his June 30, 2016 alleged

onset date through his December 31, 2016 date last insured. Tr. 35-39; 20 C.F.R. §§ 404.1505(a),
404.1508, 404.1520(a)(4)(ii), 404.1521; *see Yuckert*, 482 U.S. 137.

## II.     The ALJ Fulfilled His Affirmative Duty to Adequately Develop the Record.

Plaintiff's argument that the ALJ failed to develop the record and/or adequately investigate
the nature of his multiple sclerosis is similarly unavailing. *See* ECF No. 16-1 at 8-21. Despite the
agency's and the ALJ's diligent efforts to fulfill their affirmative duty to assist with the
development of Plaintiff's complete medical history, the record was devoid of evidence to support
the existence of a medically determinable severe impairment during the relevant period. Plaintiff
himself conceded that he did not have a diagnosis for multiple sclerosis before January 2018; and
there was no correlating treating, examining or diagnostic evidence during the six-month relevant
period. Tr.46-50, 52-53, 55, 462, 467 In addition, the ALJ also considered evidence before and
after the relevant period, as discussed above, but reasonably found this evidence likewise did not
support Plaintiff's claim.

An ALJ's duty to develop the record is "generally affirmative," arising from the
Commissioner's regulatory obligations to develop a complete medical record before making a
disability determination. *See Perez v. Chater*, 77 F.3d. 41, 47 (2d Cir. 1996) (citing 20 C.F.R. §
404.1512(d), (e)12) (other citation omitted); *see also Pratts v. Chater*, 94 F.3d 34, 47 (2d Cir.
1996) (same). Therefore, the Commissioner's regulations require the agency and/or the ALJ, to
develop Plaintiff's "complete medical history," or "the records of his medical [or treating]
source(s)," by making "every reasonable effort to help [Plaintiff] get medical evidence from" such
treating sources. 20 C.F.R. § 404.1512(b)(1)(i)-(ii)). Here, both the agency and the ALJ fulfilled
their duty to assist Plaintiff with the development of his complete medical history through
reasonable efforts.

At the state agency level, medical records were sought and received from Adult Medical Services dated July 2012, Kenmore Mercy Hospital dated January 2018, DENT through October 2018, and UBMD Neurology dated March 2020. Tr. 45, 66-68, 189-90, 265-318. The ALJ also conducted comprehensive and extensive questioning at the hearing about what treatment Plaintiff had received, ensuring that no medical records related to the period at issue were missing or outstanding. Tr. 46-62. Furthermore, the ALJ fully explained the importance of the date last insured and explained that the lack of evidence prior to that date would not support a finding for disability. Tr. 47-49.

Moreover, the ALJ held the record open for, requested, received, and entered into the record additional evidence dated after December 2016 from DENT and UBMD Neurology/Dr. Eckert through June 2020, before issuing his decision on August 2020 Tr. 46-63, 319-467, 263-65. The ALJ further held the record open to secure neurology records not only for the period after December 2016, but also from a primary care physician, although none were received. Tr. 58. However, the record reflects that the ALJ already had the lone record from Plaintiff's July 2012 visit at Adult Medical Services, and Plaintiff had not sought any further primary care treatment during the period in question. Tr. 314-16, 426, 467. *See Shauna W. v. Comm'r of Soc. Sec.*, No. 20-CV-06758, 2022 WL 1592159, at *1 (W.D.N.Y. May 19, 2022) (affirming that when an ALJ holds open the record, the ALJ will be found to have fulfilled their duty to develop the record).

Contrary to Plaintiff's arguments (*see* ECF No. 6-1 at 18-21.), the ALJ's comprehensive and thorough questioning at the hearing, as well as his efforts to secure outstanding evidence (even evidence outside the relevant period), ensured that he had Plaintiff's complete medical history, and further, confirmed that no contemporaneous medical evidence during the six-month period at issue existed. *See* Tr. 33, 26. Thus, the ALJ made every effort to develop the record and ensured he had

a complete medical record prior to issuing his decision denying Plaintiff's claim. Conversely, Plaintiff did not satisfy his burden of establishing a medically determinable severe impairment during the period at issue.

Accordingly, the record was sufficiently developed to allow for a determination as to disability, and the ALJ had no obligation to obtain additional evidence. *See* 20 C.F.R. § 404.1520b(b)(1)-(2) (If the evidence is incomplete or inconsistent but sufficient for the ALJ to make a decision, she will make a decision based on the existing evidence); *see also Perez v. Chater*, 77 F.3d at 48 (the ALJ is not required to obtain additional evidence when the record is "adequate for [the ALJ] to make a determination as to disability."). "Where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa v. Callahan*, 168 F.3d 72, 79 n. 5 (2d Cir. 1999); *see also Cook v. Comm'r of Soc. Sec.*, 818 F. App'x 108, 110 (2d Cir. 2020) (ALJ was not faced with "any clear gaps in the administrative record" that gave rise to an affirmative obligation to seek additional evidence).

Furthermore, the lack of contemporaneous treatment, examining, and diagnostic records to during the relevant period was not equivalent to an evidentiary gap attributable to the ALJ, as Plaintiff contends, particularly with respect to Dr. Eckert, as discussed in detail above. *See* ECF No. 6-1 at 20-21. Based on the foregoing, there were no obvious gaps in the record, and the available evidence was sufficient for the ALJ to make a disability determination. *See Shauna W.*, 2022 WL 1592159, at *4 (holding that where there are no obvious gaps in the record and the ALJ possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim). Accordingly, Plaintiff's argument fails.

III.     **The Appeals Council Properly Considered Plaintiff's Post-Decision Evidence.**

Finally, there is no merit to Plaintiff's argument that the Appeals Council erred by declining to consider Dr. Eckert's August 2020 opinion (Tr. 11-16) submitted to the Appeals Council after the issuance of the ALJ's decision. *See* ECF No.6-1 at 21-24. As an initial matter, the Court finds the new evidence submitted to the Appeals Council after the ALJ's decision is part of the administrative record for judicial review when the Appeals Council denies review of the ALJ's decision. *Perez v. Chater*, 77 F.3d 41, 45 (2d Cir. 1996). The regulations expressly authorize claimants to submit new and material evidence[2] to the Appeals Council without a "good cause" requirement, if it relates to the period on or before the ALJ's decision. *Id*. (citing § 404.970(b) and § 416.1470(b)). The Appeals Council evaluates the entire record, including any new and material evidence submitted if it is chronologically relevant, to determine if the ALJ's action, findings, or conclusion is contrary to the weight of the evidence currently of record. *See* 20 C.F.R. § 404.970(b); *Bushey v. Colvin*, 552 F. App'x 97, 98 (2d Cir. 2014).

Accordingly, the new evidence should be treated as part of the administrative record. *Id*. The Appeals Council is required to "evaluate the entire record including the new and material evidence submitted . . . [and] review the case if it finds that the [ALJ's] action, findings, or conclusion is contrary to the weight of the evidence currently of record." § 404.970(b); *see also* § 416.1470(b). *Id*. "Therefore, when the Appeals Council denies review after considering new evidence, the Secretary's final decision "necessarily includes the Appeals Council's conclusion that the ALJ's findings remained correct despite the new evidence." *Id*. (citing *O'Dell v. Shalala*,

---

[2] Evidence is "new" when it has not been considered previously in the administrative process. *See Ovitt v. Colvin*, 2014 WL 1806995, *3 (N.D.N.Y. May 7, 2014). New evidence is "material" where it is both relevant to the plaintiff's condition during the relevant time period, and probative. *Pollard v. Halter*, 377 F.3d 183, 193 (2d Cir. 2004). "The concept of materiality requires, in addition, a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide claimant's application differently." *Id*.

44 F.3d 855, 859 (10th Cir. 1994). Accordingly, the administrative record before this Court consists of all evidence submitted prior to judicial review, including any new evidence that was not before the ALJ.

In addition, the regulations do not require the Appeals Council to provide an elaborate explanation when it evaluates additional evidence presented. 20 C.F.R. § 404.967 (only requires Appeals Council to notify the party of its action), and § 404.970 (does not mention any information that must be in the denial notice). Furthermore, the Second Circuit has specifically acknowledged that the Appeals Council's denial of review does not amount to consideration on the merits but rather, is analogous to denial of *certiorari*. *See Pollard*, 377 F.3d, at 192 (citations omitted). Thus, the Appeals Council was not required to specify why it found the additional evidence did not warrant further review of the ALJ's decision, as Plaintiff suggests. *See* ECF No. 6-1 at 23-24.

The Court has reviewed the entire record, including the additional evidence, and finds that the Appeals Council properly determined that Dr. Eckert's August 2020 opinion did not show a reasonable probability of changing the outcome of the ALJ's decision. Tr. 2. Indeed, Dr. Eckert's August 2020 opinion was merely a rehashing of her June 2020 statement that the ALJ already considered and found unpersuasive, as discussed above. Therefore, the latter opinion was likewise unsupported by and inconsistent with substantial evidence of record and based solely on Plaintiff's subjective reports—none of which proved the existence of a medically determinable severe impairment on or before December 31, 2016. *Compare* Tr. 7-24 *with* Tr. 467. *See Reynolds v. Colvin*, 570 F. App'x at 48. Thus, Dr. Eckert's August 2020 opinion adds little of note which the ALJ had not already considered. Furthermore, Plaintiff has the burden of proving that evidence issued after the ALJ's hearing decision relates back to the relevant period, which he has failed to

do. *See Wilbon v. Colvin*, No. 15-CV-756-FPG, 2016 WL 5402702, at *1 (W.D.N.Y. Sept. 28, 2016).

As already demonstrated, the ALJ here made an informed decision on a fully developed record. Furthermore, the Appeals Council considered the new evidence, properly applied the standard, and found that the "new" evidence did not present a reasonable probability of changing the outcome of the decision. Tr. 2. *See Perez*, 77 F.3d at 45. Thus, the Appeals Council properly denied Plaintiff's request for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner. Tr. 1-5.

As detailed above, substantial evidence in the record supports the ALJ's conclusion that Plaintiff was not disabled during the period at issue. When "there is substantial evidence to support either position, the determination is one to be made by the factfinder." *Davila-Marrero v. Apfel*, 4 F. App'x 45, 46 (2d Cir. Feb. 15, 2001) (citing *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990)). While Plaintiff may disagree with the ALJ's conclusion, Plaintiff's burden was to show that no reasonable mind could have agreed with the ALJ's conclusions, which he has failed to do. The substantial evidence standard is "a very deferential standard of review – even more so than the 'clearly erroneous' standard," and the Commissioner's findings of fact must be upheld unless "a reasonable factfinder would *have to conclude* otherwise." *Brault*, 683 F.3d at 448 (emphasis in the original). As the Supreme Court explained in *Biestek v. Berryhill*, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high" and means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

## CONCLUSION

Plaintiff's Motion for Judgment on the Pleadings (ECF No. 6) is **DENIED**, and the Commissioner's Motion for Judgment on the Pleadings (ECF No. 8) is **GRANTED**. Plaintiff's Complaint (ECF No. 1) is **DISMISSED WITH PREJUDICE**. The Clerk of Court will enter judgment and close this case.

**IT IS SO ORDERED**.


DON D. BUSH
UNITED STATES MAGISTRATE JUDGE